IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* SUSAN CLASS, KENDRA BANTA, and SUSAN DAVIS, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No: 2:16-cv-00680-MSG |
| BAYADA HOME HEALTH CARE, INC., | ) ) ) | **DEMAND FOR JURY** |
| Defendant. | ) ) | |

## FIRST AMENDED *QUI TAM* COMPLAINT

Relators Susan Class, Susan Davis, and Kendra Banta on behalf of themselves and the United States of America, allege and claim against Defendant BAYADA Home Health Care, Inc. ("BAYADA") as follows:

## JURISDICTION AND VENUE

1.     This action arises under the False Claims Act, 31 U.S.C. §§ 3729-33 (the "False Claims Act").  Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1331.  Jurisdiction is also authorized under 31 U.S.C. § 3732(a).

2.     Venue lies in this judicial district pursuant to 31 U.S.C. § 3732(a), because Defendant qualifies to do business in the State of Pennsylvania, transacts

substantial business in the State of Pennsylvania, transacts substantial business in this judicial district, and can be found here. Furthermore, Defendant committed within this judicial district acts proscribed by 31 U.S.C. § 3729, to-wit: Defendant submitted to the United States false claims for payment for home healthcare services for patients whom it knew or should have known were not homebound and made or used false records material to such false claims.

## PARTIES

3.      Defendant BAYADA is one of the nation's largest providers of Medicare-supported healthcare services for the elderly. Headquartered in Moorestown, New Jersey, BAYADA provides in-home healthcare to some 22,000 patients a day in 25 different states and derives the vast majority of its revenue from Medicare and Medicaid. As described herein, BAYADA: (a) knowingly admitted, recertified, and billed the United States for home healthcare provided to patients it knew were not homebound and; (b) knowingly made, used, or caused to be made or used, a false record or statement material to its obligation to re-pay or transmit money to the United States for such non-homebound patients; and (c) knowingly concealed or knowingly and improperly avoided or decreased its obligations to re-pay or transmit money to the United States for such non-homebound patients.

4.      Relator Susan Class is a licensed registered nurse (RN) with many years of experience in the home healthcare setting. During her employment as a BAYADA

nurse and case manager from 2012 to 2015, Ms. Class was instructed by BAYADA supervisors or was aware that others were instructed to admit and retain homehealth patients who were not homebound and did not qualify for the Medicare homehealth benefit.

5.    Relator Susan Davis was employed by Bayada as a client services manager from 2005 to December, 2014. As described more specifically below, Ms. Davis was frequently ordered by Bayada clinical supervisors to schedule nursing assessments and interventions that were not medically necessary in order to admit patients who did not require skilled nursing care. In Ms. Davis's personal, daily experience at BAYADA, she witnessed the methods through which BAYADA, through its management personnel and corporate-wide systems, records false information in patient charts and bills the United States for care that was never performed or was not medically necessary.

6.    Relator Kendra Banta worked as an RN for BAYADA from June, 2009 to December, 2014. Ms. Banta witnessed both BAYADA's consistent admission of patients who were not homebound and its clinical policies designed to result in the admission of inappropriate patients and the inflation of its Medicare billings through the recording of false clinical information in patient charts and care plans.

7.    Shortly before filing their original Complaint, Relators disclosed a draft copy of the initial False Claims Act *qui tam* Complaint, by and through their

attorneys, to the United States Attorney's Office for the Eastern District of Pennslyvania. This disclosure was made as a courtesy to the Government attorneys that would be reviewing the case pursuant to 31 U.S.C. §3730(a), 31 U.S.C. §3730(b)(1) and 31 U.S.C. §3730(b)(2). Further, such disclosure was made to comply with the original source provision of the False Claims Act, pursuant to 31 U.S.C. §3730(e). Accordingly, to the extent that any public disclosure has been made, Relators are the original source of the information for purposes of that Section. Alternatively, Relators have knowledge that is independent of and materially adds to any purported publicly disclosed allegations or transactions, and Relators voluntarily provided that information to the Government before filing this Complaint. Contemporaneous with the filing of their intial Complaint, Relators served upon the Government a statement of the material evidence in their possession upon which their claims are based.

## MEDICARE HOME HEALTH COVERAGE

8.  Through the Medicare program administered by the Center for Medicare and Medicaid Services (CMS), the United States provides health insurance to eligible citizens. *See* 42 U.S.C. §§ 1395, *et. seq*. As part of its coverage, Medicare pays for some "home health services" for qualified patients.

9.  To qualify for home healthcare reimbursement under Medicare, a patient must: (1) be homebound – *i.e.*, the patient is generally confined to her home

4

and can leave only by dent of considerable effort; (2) need part-time skilled nursing services or speech therapy, physical therapy, or continuing occupational therapy as determined by a physician; and (3) be under a plan of care established and periodically reviewed by a physician and administered by a qualified home health agency (HHA). *See* 42 U.S.C. §§1395f; 1395x(o).

10.     When a patient so qualifies, Medicare will pay for: (1) part-time skilled nursing care; (2) physical, occupational, or speech therapy; (3) medical social services (counseling); (4) part-time home health aide services; and (5) medical equipment and supplies. *Id.*

11.     Medicare pays for home healthcare by way of a Prospective Payment System (PPS). *See* 42 U.S.C. § 1395fff; 42 C.F.R. § 484. The PPS is based on a "national prospective 60-day episode payment," a rate based on the average cost of care over a 60-day episode for the patient's diagnostic group. *Id.*

12.     A patient is placed in a diagnostic group based upon the patient's comprehensive initial assessment by the HHA. 42 C.F.R. § 484.55. Upon a physician's referral, an HHA is required to make an initial assessment visit and perform a comprehensive assessment encompassing the patient's clinical, functional, and service characteristics. *Id.*

13.     Accordingly, a registered nurse or therapist must evaluate the patient's eligibility for Medicare home healthcare, including homebound status, and must determine the patient's care needs using the OASIS instrument. *Id.*

14.     The OASIS diagnostic items describe the patient's observable medical condition (clinical), physical capabilities (functional), and expected therapeutic needs (service). Based upon the OASIS information – and in turn upon the expected cost of caring for the patient – the patient's "case mix assignment" is determined and the patient is assigned to one of eighty Home Health Resource Groups (HHRGs).

15.     The patient's HHRG assignment and other OASIS information are represented by a Health Insurance Prospective Payment System (HIPPS) code that is used by Medicare to determine the rate of payment to the HHA for a given patient.

16.     Once the HHA has submitted the patient's OASIS information, partial payment is made by CMS based on a presumptive 60-day episode. 42 C.F.R. § 484.205.

17.     The initial base rate may be subject to upward adjustment, such as where there is a "significant change in condition resulting in a new case-mix assignment," or downward adjustment, such as where the number of predicted therapy visits substantially exceeds the number actually performed. 42 C.F.R. § 484.205. Throughout the patient's episode, the HHA is required to maintain clinical

notes documenting the patient's condition, health services performed, and continued need for skilled care. *See* 42 U.S.C. 1395x(o); 42 C.F.R. § 484.84.

18.    In order to continue receiving covered care for another 60-day episode, the patient must be re-assessed by the HHA within the final five days of the initial episode and be re-certified by a physician as requiring and qualifying for home healthcare.  42 C.F.R. § 484.205.

19.    If, for any reason, the HHA provides four or fewer visits during a patient's home health episode, the episode is subject to a "low utilization payment adjustment (LUPA)." 42 C.F.R. § 484.230. Rather than being entitled to the full prospective payment amount, the HHA will be entitled to payment on a per-visit basis. *Id.* Accordingly, the HHA may be obligated to repay amounts already received as a prospective payment.

20.    Medicare will not pay for home health services provided to patients unless those patients are homebound and require intermittent skilled nursing care or skilled therapy. *See* 42 U.S.C. §1395f. It is a universal requirement of the Medicare program that all services provided must be reasonable and medically necessary. *See* 42 U.S.C. §1395y(a)(1)(A). Medicare providers may not bill the United States for medically unnecessary services or for procedures performed solely to generate profit of the provider. *Id.*

21.     To enroll as a Medicare provider, Defendant was required to submit a Medicare Enrollment Application for Institutional Providers.  *See* CMS Form 855A. In submitting Form 855A, Defendant made the following "Certification Statement" to CMS:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal Anti-Kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

Form CMS-855A.

22.     Defendant then billed Medicare by submitting a claim form (CMS Form 1450) to the fiscal intermediary ("FI") responsible for administering Medicare home health claims on behalf of the United States.  *See* CMS Form 1450.  Each time it submitted a claim to the United States through the FI, Defendant certified that the claim was true, correct, and complete, and that it complied with all Medicare laws and regulations.

23.     Defendant thus certified that each claim for a home health prospective payment represented home health services provided to a homebound, qualifying patient in need of such services, and CMS expressly conditioned its payment on the

truth and accuracy of that certification. Defendant further certified that its programs were in compliance with Medicare regulations, including the requirement that Defendant perform and correctly document its skilled nursing and supervisory visits.

## DEFENDANT KNOWINGLY BILLED FOR
## NON-HOMEBOUND PATIENTS

24.    BAYADA knowingly bills the United States for patients who are not homebound and do not qualify for the Medicare home health benefit, in violation of 42 U.S.C. § 1395f. In the BAYADA offices where Relators were employed, it was well known among staff that certain patients were obviously not homebound, but were kept on service regardless.

25.    Relator Davis is familiar with numerous patients who either refused home health services or called the BAYADA offices to request that they be taken of services because they no longer required care. Often these patients were not homebound. Ms. Davis was instructed by BAYADA administrators Richard York and Karen Rizzo, to schedule follow up calls with these patients designed to persuade the patients to acquiesce to admission or re-admission by BAYADA. One BAYADA physical therapist, Jason Wedman (Wedman), frequently kept patients on unnecessarily and for long periods, and Relator Davis often took calls from patients of Wedman's who did not believe they needed further therapy and requested to be taken off service, only for Wedman to "talk them into" remaining on service.

26.     The following patients were falsely billed to the United States using false records containing false assessment data, or who were admitted and billed by BAYADA despite their obvious non-qualification, or both:

a.     Patient C.P. was certified by BAYADA in or around November, 2014 as homebound and in need of skilled nursing care. BAYADA caregivers were scheduled to visit Patient C.P. twice a week for wound care, despite the fact that Patient C.P. did not have a wound that required care and despite the fact that Patient C.P. was not homebound and frequently could not be reached at home because she was not there. Relator Kendra Banta had to specifically pre-schedule times for her visits to Patient C.P., because Patient C.P. was frequently away from her home. On one visit, Patient C.P. informed Relator Banta that she would not be home for a subsequent pre-scheduled visit because she had a "big birthday party" to attend. Relator Banta reported such excursions away from the home to BAYADA but was told to continue to provide the purported home health services to Patient C.P. BAYADA retained Patient C.P. on service and continued to bill the United States for unnecessary care until approximately January, 2015. Despite its express knowledge

that Patient C.P. was not homebound, BAYADA retained all of its payments for her care, rather than reimbursing the money to Medicare;

b.      Relator Kendra Banta was assigned as RN for Patient M.C. BAYADA originally admitted Patient M.C. for wound care. During her second 60 day episode, Patient M.C. was hospitalized for symptoms related to her congestive heart failure (CHF). When Patient M.C. returned from the hospital, Relator Banta found that her wound had healed, that her CHF was well-managed, and that Patient M.C. was not homebound, as she was frequently leaving home for reasons not related to her medical treatment.     Nevertheless, BAYADA manager Sara Gates instructed Ms. Banta not to discharge Patient M.C., because it would result in a partial episode and cost BAYADA money. Instead, BAYADA charged and the United States paid for Relator Davis to educate Patient M.C. about management of her CHF, even though Patient M.C. was a long time registered nurse, was thoroughly familiar with CHF and its management, and her condition was well-managed and did not require skilled care. Patient M.C. was not homebound and was eventually discharged

when she left town for a holiday trip. BAYADA retained all payments received from Medicare for Patient M.C.'s purported education even after they became aware that she was frequently leaving the home and planned such a holiday trip out of town;

c.    Patient V.A. was admitted to home health by Bayada and certified by Bayada as homebound. Bayada visited Patient V.A. once every 3 weeks for the purpose of changing her Foley catheter by Bayada nurse Laura Weinstein, R.N. Patient V.A. was living in a facility at the time that Bayada billed the United States for her home health care. The facility provided weekly transportation to a gambling casino for the entertainment and enjoyment of its residents, and Patient V.A. was known by Bayada staff to have participated in and enjoyed these weekly casino excursions during the time Bayada certified her as homebound and billed the United States for her homebound care. Bayada knew from these casino visits that Patient V.A. was not homebound and that her excursions to the casino – if discovered by the United States – would result in the discovery of Bayada's false certification of homebound status for Patient V.A. Rather than reporting these excursions to Medicare and reimbursing

Medicare for the money falsely paid to Bayada for Patient V.A.'s home health services, Bayada staff attempted to cover up the problem and retain the false payments. Bayada admonished the facility staff to refuse to allow Patient V.A. to continue her visits to the casino in order to make it appear that she was homebound when she was not. In order to convince the facility to go along with this cover-up scheme and to deny Patient V.A. her weekly excursions and improperly sequester her in the facility, Bayada threatened to stop sending Nurse Weinstein to help the facility with the Folely catheter changes. Accordingly, Patient V.A. was denied her weekly entertainment excursions and was improperly confined to the facility so that Bayada could retain its false payments from Medicare and continue to submit false claims to Medicare. This not only caused unfair treatment to Patient V.A. by denying her the excursions that she otherwise enjoyed but also caused Medicare to falsely pay much needed funds to Bayada.

27. By knowingly billing Medicare for the above detailed patients whom Bayada kew or should have known were not homebound and by retaining such payments and concealing or knowingly and improperly avoiding its obligations to

re-pay the United States for the above-detailed patients, Defendant has violated the False Claims Act.

**COUNT ONE**
**PRESENTING OR CAUSING TO BE PRESENTED**
**FALSE CLAIMS UNDER 31 U.S.C. § 3729**

28.     Relators adopt and incorporate the previous paragraphs as though fully set forth herein.

29.     Defendant knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – presented or caused to be presented false or fraudulent claims to the United States for payment or approval, to wit:

> a.     Defendant submitted false claims for home healthcare provided to patients whom Defendant knew were not homebound or did not require skilled care and did not meet Medicare or Medicaid requirements for home healthcare, in violation of 42 U.S.C. §1395f;

> d.     Defendant submitted false claims for home health services premised upon Defendant's false or fraudulent certifications of compliance with Medicare regulations as made on CMS Forms 885A and 1450 and elsewhere;

30.     The United States paid the false claims described herein.

31.    Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendant and others by the United States through Medicare and Medicaid for such false or fraudulent claims.

WHEREFORE, Relators demand judgment in their favor on behalf of the United States, and against Defendant, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Relators may be entitled.

## COUNT TWO
## MAKING OR USING FALSE STATEMENTS OR RECORDS MATERIAL TO A FALSE CLAIM UNDER 31 U.S.C. § 3729

32.    Relators adopt and incorporate the previous paragraphs as though fully set forth herein.

33.    Defendant knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim or to get a false or fraudulent claim paid or approved by the United States, to wit:

a.    Defendant made and used false records reflecting purported nursing and therapy visits rendered to patients who did not qualify under the Medicare home health benefit, including but not limited to, those patients described in paragraph 39, in violation of 42 U.S.C. § 1395y(a)(1)(A) and the Medicare regulations cited *supra*;

b.    Defendant made and used false assessment data that inaccurately reflected patient conditions and falsely emphasized that the patients were homebound when they were not;

e.    Defendant made and used false CMS Forms 1450 and 855A and other false certifications regarding past, present, or future compliance with a prerequisite for payment or reimbursement by the United States through Medicare or Medicaid when in fact Defendant intended to – and did – defraud the Medicare system by falsely claiming payment for, *inter alia*, the specific pateints described in paragraph 39.

34.    The false records or statements described herein were material to the false claims submitted or caused to be submitted by Defendant to the United States.

35.    In reliance upon Defendant's false statements and records, the United States paid false claims submitted by Defendant that it would not have paid if not for those false statements and records.

36.     Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed by the United States for such false or fraudulent claims.

WHEREFORE, Relators demands judgment in their favor on behalf of the United States, and against Defendant, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Relators may be entitled.

**COUNT THREE**
**"REVERSE FALSE CLAIMS" UNDER 3729(a)(1)(G)**

37.     Relators adopt and incorporate the previous paragraphs as though fully set forth herein.

38.     By and through the fraudulent schemes described herein, Defendant knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the United States, or knowingly concealed or knowingly and improperly avoided an obligation to pay or transmit money or property to the United States, to wit:

> Defendant knew that it had received much needed Medicare dollars in
>
> home health PPS payments for patients who did not qualify for the

Medicare home health benefit, yet Defendant took no action to satisfy
its obligations to the United States to repay or refund those payments
and instead retained the funds and continued to bill the United States;

39.     As a result of Defendant's fraudulent conduct, the United States has
suffered damage in the amount of funds that belong to the United States but are
improperly retained by Defendant.

WHEREFORE, Relators demand judgment in their favor on behalf of the
United States, and against Defendant, in an amount equal to treble the damages
sustained by reason of Defendant's conduct, together with civil penalties as
permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different,
or further relief to which Relators may be entitled.

## RELATORS DEMAND A TRIAL BY STRUCK JURY

Respectfully submitted,

KENNEY & McCAFFERTY, P.C.

DATE: 7|5|17          BY

Emily C. Lambert PA ID No.: 205073
M. Tavy Demming PA ID No.: 83190
1787 Sentry Park West
Building 18, Suite 410
Blue Bell, PA 19422
(215) 367- 4333
Fax: (215) 367-4335
Email: elambert@kenneymccafferty.com

18

James F. Barger, Jr. GA ID No.: 843064
Benjamin P. Bucy GA ID No.: 526064
**FROHSIN & BARGER, LLC**
100 Main Street
Saint Simons Island, GA 31522
(205) 933-4006
Fax: (205) 543-7899
Email: jim@frohsinbarger.com

Attorneys for Relators

## Certificate of Service

On this the 7th day of July, 2017, Relators hereby certify that in compliance with Rule 4 of the Federal Rules of Civil Procedure, service of this *Qui Tam* Complaint has been sent to all counsel of record through the Court's online CM/ECF system:

**JEFFREY M. KOLANSKY**
ARCHER & GREINER
Three Logan Square
1717 Arch Street, Suite 3500
PHILADELPHIA, PA 19103-7393
215-963-3300
jkolansky@archerlaw.com

**KERRI E. CHEWNING**
Archer & Greiner
One Centennial Square
Haddonfield, NJ 08033
856-616-2685
kschewning@archerlaw.com

**DANIEL S. REINBERG**
POLSINELLI PC
150 N RIVERSIDE PLAZA SUITE 3000
CHICAGO, IL 60606
312-819-1900
dreinberg@polsinelli.com

**ASHER D. FUNK**
POLSINELLI PC
150 N. RIVERSIDE PLAZA
SUITE 3000
CHICAGO, IL 60606
312-819-1900
afunk@polsinelli.com

**KEVIN M. COFFEY**
POLSINELLI PC
150 N. RIVERSIDE PLAZA
SUITE 3000
CHICAGO, IL 60606
312-819-1900
kcoffey@polsinelli.com

**GREGORY B. DAVID**
U.S. ATTORNEY'S OFFICE
615 CHESTNUT ST STE 1250
PHILADELPHIA, PA 19106
215-861-8521
gregory.david@usdoj.gov

**MARGARET L. HUTCHINSON**
U.S. ATTORNEY'S OFFICE
615 CHESTNUT STREET
SUITE 1250
PHILADELPHIA, PA 19106
215-861-8282
215-861-8618 (fax)
margaret.hutchinson@usdoj.gov

OF COUNSEL