**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA**<br>**ex rel. SUSAN CLASS, et al.,** | : | **CIVIL ACTION** |
| | : | |
| **Plaintiffs-Relators,** | : | |
| | : | |
| **v.** | : | **No. 16-680** |
| | : | |
| **BAYADA HOME HEALTH CARE, INC.,** | : | |
| | : | |
| **Defendant.** | : | |

**Goldberg, J.**                                                                 **September 24, 2018**

<u>**MEMORANDUM OPINION**</u>

This is a *qui tam* action brought by Relators, Susan Class, Kendra Banta, and Susan Davis ("Relators"), against Defendant, Bayada Home Health Care ("Bayada"), under the False Claims Act ("the FCA"). Relators allege that Bayada falsely billed Medicare for home health services provided to patients that it knew were not "homebound" in violation of 31 U.S.C. § 3729(a)(1)(A), submitted false statements in support of such bills in violation of 31 U.S.C. § 3729(a)(1)(B), and retained payments for such false claims in violation of 31 U.S.C. § 3729(a)(1)(G).

Bayada has moved to dismiss all claims pursuant to Federal Rule of Civil Procedure 12(b)(1), urging that Relators do not have standing to pursue their claims because they signed enforceable "Separation Agreements" when they left their employment with Bayada, which released Bayada from "any and all claims." In the alternative, Bayada asks that I dismiss all claims pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b), contending that the Amended Complaint fails to meet the threshold pleading requirements.

For the reasons discussed below, I will deny Bayada's Motion to Dismiss.

1

# I.    BACKGROUND

Relators' Amended Complaint sets forth the following pertinent facts:[1]

Defendant is a provider of in-home healthcare to approximately 22,000 patients in 25 states.  Such services can be eligible for Medicare coverage.  To qualify for home healthcare reimbursement under Medicare, a patient must (1) be "homebound;" (2) require part-time skilled nursing services or speech therapy, physical therapy, or continuing occupational therapy as determined by a physician; and (3) be under a plan of care established and periodically reviewed by a physician and administered by a qualified home health agency ("HHA").  (Am. Compl. ¶9.) To be "homebound," a patient "is generally confined to her home and can leave only by dent of considerable effort."  (Id.)  After a physician refers a patient for homebound services, an HHA does an initial assessment using a diagnostic instrument referred to as "OASIS."  (Id. ¶¶ 3, 12–14.)

When a patient qualifies for homebound services, Medicare will pay for part-time skilled nursing care, physical, occupational, and speech therapy, counseling, part-time home health aide services, and medical equipment and supplies.  Medicare pays for home healthcare in 60-day pay "episodes" through a Prospective Payment System ("PPS").  Throughout a patient's 60-day episode, the HHA is required to document their condition, services performed, and continued need for skilled care.  For a patient to continue receiving home healthcare for another 60-day episode, HHA must reassess the patient and that patient must be re-certified by a physician as requiring and qualifying for home healthcare.  A universal requirement of the Medicare program is that all services provided must be reasonable and medically necessary, and Medicare providers

---

[1]    When deciding a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court must assume the veracity of all well-pleaded facts found in the complaint.  Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).  Thus, I will assume that all the facts found in the Amended Complaint are true for purposes of Bayada's Rule 12(b)(6) and 9(b) arguments.

may not bill the Government for medically unnecessary services or procedures performed only to generate profit for the provider.  (Id. ¶¶ 10–11, 17–18, 20.)

Relators are former Bayada employees.  Relator Class worked as a registered nurse ("RN") and case manager for Bayada from 2012 through 2015.  Relator Davis worked as a client services manager for Bayada from 2005 through December of 2014.  Relator Banta worked as an RN for Bayada from June of 2009 through December of 2014.  Relators allege that Bayada (1) "knowingly admitted, re-certified, and billed the United States for home healthcare provided to patients it knew were not homebound;" (2) "knowingly made, used, or caused to be made or used, a false record or statement material to its obligation to re-pay or transmit money to the United States for such non-homebound patients;" and (3) "knowingly concealed or knowingly and improperly avoided or decreased its obligations to re-pay or transmit money to the United States for such non-homebound patients."  (Id. ¶¶ 3–6.)

Relators allege that it was "well known among staff that certain patients were obviously not homebound, but were kept on service regardless."  Relator Davis claims that she is familiar with "numerous patients" who either refused home health services or contacted Bayada's offices to request they be removed from home health services because they no longer required such care. Relator Davis was allegedly instructed by Bayada administrators Richard York and Karen Rizzo to schedule follow-up phone calls with these patients.  Relators claim these calls were "designed to persuade the patients to acquiesce to admission or re-admission."  Relators also allege that Jason Wedman, a Bayada physical therapist, "frequently kept patients on unnecessarily and for long periods," and that Relator Davis "often" received phone calls from patients of Wedman who believed they did not need further therapy and requested to be taken off service but Wedman "talked them into" remaining on service.  (Id. at ¶¶ 25, 29.)

Relators provide information about three patients they claim were billed to the Government using false records that contained false assessment data, or who were admitted and billed by Bayada despite non-qualification for home health services. They first allege that patient C.P. was certified as homebound and in need of skilled nursing in November of 2014. Caregivers were scheduled to visit C.P. twice a week for wound care. Relators allege that C.P. did not have a wound that required care, was not homebound, and "frequently" could not be reached at home by telephone because she was not there. Relator Banata pre-scheduled times for her visits to C.P. because C.P. was "frequently" away from her home, and on one visit, C.P. told Relator Banata that she would not be home for the next visit because she had a "big birthday party" to attend. Despite reports of "such excursions" to Bayada, Relator Banta was instructed to continue providing home health services to C.P. According to Relators, Bayada continued to bill the Government for unnecessary care for C.P. until approximately January of 2015 despite its "express knowledge" that C.P. was not homebound. (Id. at ¶ 26.)

Next, Relators allege that Relator Banta was the assigned RN for patient M.C. who was originally admitted for wound care and subsequently was hospitalized for symptoms related to congestive heart failure. When M.C. returned home from the hospital, Relator Banta found that her wound had healed and her congestive heart failure was well-managed. Relator Banta also found that M.C. was not homebound because she was frequently leaving home for reasons unrelated to her medical treatment. Relators allege that, despite this, Manager Sara Gates instructed Relator Banta not to discharge M.C. because "it would result in a partial episode and cost Bayada money." Relators allege that Bayada instead charged the Government for Relator Davis to educate M.C. about management of her congestive heart failure, even though M.C. was an RN herself and was familiar with congestive heart failure and its management. According to

Relators, M.C.'s condition was well-managed and did not require skilled nursing care. M.C. was eventually discharged when she left town for a holiday trip, yet Bayada retained all payments received from Medicare for Patient M.C.'s purported education even after they learned she was frequently leaving home and had planned a holiday trip out of town. (Id.)

Finally, Relators allege that patient V.A. was certified as homebound and visited by Bayada every three weeks for the purpose of having her catheter changed by nurse Laura Weinstein. V.A. was living in a facility at the time that Bayada billed for her care, and the facility provided weekly transportation to a casino. Relators allege that Bayada staff knew that V.A. participated in these trips and enjoyed them during the time she was certified as homebound and her services were being billed to the Government. Relators allege Bayada knew from these casino visits that V.A. was not homebound and that discovery of these visits by the Government would result in the Government learning of Bayada's false certification. Rather than reporting these excursions or reimbursing Medicare, Bayada staff instead attempted to cover up the trips and retain the payments. Relators allege that Bayada warned the staff at the facility in which V.A. resided to refuse to permit V.A. to continue her casino trips in order to make it appear she was homebound, although she was not. Bayada allegedly threatened to cease sending Nurse Weinstein to help the facility with catheter changes if the facility staff did not stop V.A. from going on the casino trips. As such, V.A. was denied her weekly casino trips and confined to the facility so that Bayada could retain its false payments from Medicare and continue to submit further false claims to Medicare. (Id.)

Relators contend that Bayada knowingly billed Medicare for these three patients whom they knew or should have known were not homebound, and retained payments and concealed or

knowingly and improperly avoided its obligations to reimburse the United States for these patients. (Id. at ¶ 27.)

Relators filed their original Complaint under seal on February 11, 2016. After numerous extensions, the Government declined to intervene. Relators filed their Amended Complaint on July 6, 2017, bringing the following FCA claims: violation of 31 U.S.C. § 3729(a)(1)(A) ("Count I"), 31 U.S.C. § 3729(a)(1)(B) ("Count II'), and 31 U.S.C. § 3729(a)(1)(G) ("Count III").

## II.    LEGAL STANDARD

Bayada first moves to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction. Bayada's motion is a factual attack on jurisdiction. Unlike a facial challenge that concerns a pleading deficiency, Bayada maintains that Relators have not complied with the jurisdictional prerequisites contained in the FCA. United States ex rel. Atkinson v. Pa. Shipbuilding, 473 F.3d 506, 512 (3d Cir. 2007). Accordingly, I may consider and weigh evidence outside the pleadings to determine if I have jurisdiction. Gould Elec. Inc. v. United States, 220 F.3d 169, 178 (3d Cir. 2000) (citing Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977)). However, "no presumptive truthfulness attaches to plaintiff's allegations." Mortensen, 549 F.2d at 891. Rather, a qui tam relator must establish by a preponderance of the evidence that the court has jurisdiction. Gould, 220 F.3d at 178 (citing Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991)).

Bayada also moves to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b). To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The plausibility standard requires more than a

"sheer possibility that a defendant has acted unlawfully." Id. To determine the sufficiency of a complaint under Twombly and Iqbal, a court must take the following three steps: (1) the court must "tak[e] note of the elements a plaintiff must plead to state a claim"; (2) the court should identify the allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth"; and (3) "where there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." Burtch v. Milberg Factors, Inc., 662 F.3d 212, 221 (3d Cir. 2011) (citations omitted).

It is well-established, however, that *qui tam* actions brought under the FCA must be pled with particularity under Federal Rule of Civil Procedure 9(b). United States ex rel. Schmidt v. Zimmer, Inc., 386 F.3d 235, 242 n.9 (3d Cir. 2004) (citing United States ex rel. LaCorte v. SmithKline Beecham Clinical Labs., Inc., 149 F.3d 227, 234 (3d Cir. 1998)); United States ex rel. Spay v. CVS Caremark Corp., 913 F. Supp. 2d 125, 143 (E.D. Pa. 2012).

Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." This heightened pleading standard requires plaintiffs to "plead with particularity precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984). This standard requires a description of the "'who, what[,] when, where and how' of the events at issue." In re Rockefeller Ctr. Props., Inc. Secs. Litig., 311 F.3d 198, 217 (3d Cir. 2002) (citations omitted). In the FCA context, the United States Court of Appeals for the Third Circuit requires plaintiffs to provide only "particular details of a scheme to submit false claims paired with reliable indicia

that lead to a strong inference that claims were actually submitted." Foglia v. Renal, Ventures Mgmt., LLC, 754 F.3d 153, 157–58 (3d Cir. 2014 (quoting United States ex rel. Grubbs v. Kanneganti, 565 F.3d 180, 190 (5th Cir. 2009)).  An FCA claimant is not required to show "the exact content of the false claims in question" to survive a motion to dismiss, as "requiring this sort of detail at the pleading stage would be 'one small step shy of requiring production of actual documentation with the complaint, a level of proof not demanded to win at trial and significantly more than any federal pleading rule contemplates.'"  Foglia, 754 F.3d at 156 (quoting Grubbs, 565 F.3d at 190).

### III.  LEGAL ANALYSIS

#### A.  The Court Does Not Lack Subject Matter Jurisdiction

Bayada avers that Relators do not have standing to bring their FCA claims because they signed valid and enforceable Separation Agreements that prohibit them from bringing "any and all" claims related to their employment against Bayada.  Bayada submits that because Relators do not have standing, I do not have subject matter jurisdiction.  Relators respond that they have standing to bring their claims because (1) the Separation Agreements do not contemplate FCA claims, and (2) public policy prohibits the enforcement of the Separation Agreements.

Among other elements, a plaintiff must allege an "injury in fact" to establish Article III standing.  Vermont Agency of Natural Res. v. United States ex rel. Stevens, 529 U.S. 765, 771 (2000).  In *qui tam* cases, where it is the Government that has sustained the injury in fact, a relator nonetheless possesses standing to bring an FCA claim "because the [FCA] 'effect[s] a partial assignment of the Government's damages claim' and that assignment of the 'United States' injury in fact suffices to confer standing on [the relator].'"  Sprint Commc'ns Co. v. APCC Servs., Inc., 554 U.S. 269, 286 (2008) (quoting Vermont Agency, 529 U.S. at 773, 774).

The United States Supreme Court has thus recognized that "'the assignee of a claim has standing to assert the injury in fact suffered by the assignor.'" Id. (quoting Vermont Agency, 529 U.S. at 773). It is Bayada's position that because Relators released all claims against Bayada in the Separation Agreements, they cannot state an injury in fact.

It is well known that a relator may not enter into an enforceable settlement or release of *qui tam* claims after the filing of an FCA action. See 31 U.S.C. § 3730(b)(1) ("The action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting."); see also United States ex rel. Radcliffe v. Purdue Pharma L.P., 600 F.3d 319, 326 (4th Cir. 2010). However, the FCA does not address whether a relator's release of *qui tam* claims executed before the filing of a complaint (referred to as a "pre-filing release") is enforceable. Radcliffe, 600 F.3d at 326.

Although the Third Circuit has not opined on the enforceability of pre-filing releases that bar subsequent *qui tam* claims, other circuits have permitted pre-filing releases of claims to bar a subsequent FCA action. There is an "emerging agreement" among other circuits that such releases bar FCA claims if "(1) the release can fairly be interpreted to encompass qui tam claims and (2) public policy does not otherwise outweigh enforcement of that release." United States ex rel. Nowak v. Medtronic, Inc., 806 F. Supp. 2d 310, 336 (D. Mass. 2011) (citing Radcliffe, 600 F.3d at 319; United States ex rel. Ritchie v. Lockheed Martin Corp., 558 F.3d 1161 (10th Cir. 2009); United States ex. rel. Hall v. Teledyne Chang Albany, 104 F.3d 230 (9th Cir. 1997)). District courts within the Third Circuit have cited with approval the framework developed in these other circuits when deciding whether to enforce a settlement agreement provision that releases claims to bar later-filed *qui tam* actions. See, e.g., United States ex rel. Charte v.

American Tutor, Inc., No. 10-cv-3318, 2018 WL 1960448, at *3 (D.N.J. April 26, 2018); United

States ex rel. Gohil v. Sanofi-Aventis U.S. Inc., 96 F. Supp. 3d 504, 515−16 (E.D. Pa. 2015).

After a review of the above-referenced precedent and for the following reasons, I

conclude that, even if the Separation Agreements can fairly be interpreted to contemplate FCA

claims, public policy does not favor enforcement of the agreements.

> i.   *The Separation Agreements Encompass FCA Claims*

Bayada urges me to read the Separation Agreements as encompassing FCA claims.

Relators respond that the Separation Agreements do not contemplate FCA claims, evidenced by

their silence as to the FCA, despite including an express list of other federal statutes under which

Relators cannot bring claims. According to Relators, Bayada "deliberately omitted" FCA claims

from the Separation Agreements.

> The Separation Agreements all state the following:
>
> [Relator] agrees by signing this Agreement she is giving up each and every claim she may currently have against **BAYADA**, its officers and employees, in their official capacities, for any type of damages, costs or fees, lost wages or disability benefits related to her work or personal relationships with the company. This includes a full release of any and all claims, charges, lawsuits, grievances or other causes of action against **BAYADA** by reason of any matter existing at any time prior to signing this Agreement.
>
> This Release includes any claim, known or unknown, related to or arising out of [Relator's] employment with **BAYADA** and her separation of employment.
>
> [Relator] has not filed any claims or charges and is giving up the right to receive any compensation, payment or other consideration, either money or otherwise, from **BAYADA** for claims, charges or causes of action released by this Agreement. (Def.'s Mot. to Dismiss Ex. 1, ¶ 10; Ex. 2, ¶ 10; Ex. 3 ¶ 10.)

Under The Separation Agreements, Relators cannot sue or file a charge against Bayada for:

> • Title VII of the Civil Rights Act, which prohibits discrimination in employment based on race, color, religion, sex or national origin;

• The Genetic Information and Discrimination Act (GINA) which prohibits discrimination in employment based on a person's potential or actual personal of [sic] familial genetic trait(s);

• The Americans with Disabilities Act (ADA) which prohibits discrimination in employment based on a person's disability or handicap;

• The Age Discrimination in Employment Act (ADEA) and the Older Workers Benefit Protection Act (OWBPA), which prohibits discrimination in employment or benefits based on a person's age;

• The Equal Pay Act (EPA) which provides protection from gender bias pay practices;

• The Occupational Safety and Health Act (OSHA), which governs safety standards in the workplace;

• The Family and Medical Leave Act (FMLA), which entitles an employee to take reasonable leave for her own medical reasons, for birth or adoption of a child or care of a child, spouse or parent with a serious health condition;

• Employee Retirement Income Security Act of 1974 (ERISA) which governs pension and welfare plans and prohibits interference with individual rights related to same, with the exception of any rights [Relator] may have to vested benefits, or those benefits already due to her as of the signing of this Agreement; [or]

• Any other claims under contract, quasi contract, claims of tort, wrongful discharge, emotional distress or other similar claims or any legal or equitable theory. (Id.)

The Separation Agreements also provide that if one of the Relators files "a claim, law suit or action in any court, judicial forum or with any administrative agency, related to any of the Released claims or matters covered by this Agreement, [they] agree, **BAYADA** may use the signed Agreement to request dismissal of or the end of same." (Id.)

Courts have found similar language in releases sufficient to incorporate FCA claims. See, e.g., United States ex rel. Radcliffe v. Purdue Pharma L.P., 600 F.3d 319, 328 (4th Cir. 2010) (finding that the FCA claims were included in the release where the relator agreed to "forever discharge[] [Purdue] of and from any and all liability *to Employee* for actions or causes

of action, suits, [or] claims . . . whatsoever, in law or equity, which, Employee . . . ever had, may now have or hereafter can, shall or may have against [Purdue] as of the date of the execution of this Agreement"); United States ex rel. Hall v. Teledyne Wah Chang Albany, 104 F.3d 230, 233–34 (9th Cir. 1997) (finding that the FCA claims were barred by a release that covered "any other claims or complaints which could have been brought in any other type of action of proceeding"); United States ex rel. Nowak v. Medtronic, Inc., 806 F. Supp. 2d 310, 337 (D. Mass. 2011) (finding that the language releasing "any and all claims of any kinds, known or unknown that arose on or before the time [the relator] signed this agreement" included FCA claims).

Although the FCA is not explicitly listed in Relators' Separation Agreements, the agreements state that Relators "g[ave] up each and every claim [they] may currently have against **BAYADA**, its officers and employees, in their official capacities, for any type of damages, costs or fees, lost wages or disability benefits related to her work or personal relationships with the company. This includes a full release of any and all claims, charges, lawsuits, grievances or other causes of action against **BAYADA** by reason of any matter existing at any time prior to signing this Agreement." (Def.'s Mot. to Dismiss Ex. 1, ¶ 10; Ex. 2, ¶ 10; Ex. 3 ¶ 10 (emphasis added)). The agreements further state that "[t]his Release includes any claim, known or unknown, related to or arising out of [Relator's] employment with **BAYADA** and her separation of employment." (Id. (emphasis added)).

This language is expansive enough to include FCA claims. Moreover, the Third Circuit has found that explicit mention of a statute is not a prerequisite to enforceability of a release and that broad release language is adequate. See Geraghty v. Insur. Servs. Office, Inc., 369 F. App'x

402, 406 (3d Cir. 2010) (finding broad language of release included release of a New Jersey state law claim where the release used the language "any and all").[2]

ii.     *Public Policy Disfavors Enforcement of the Separation Agreements*

Bayada argues that enforcement of the Separation Agreements comports with public policy based on two separate theories. First, Bayada urges that courts generally enforce a pre-filing release as long as Relators' claims were sufficiently disclosed to the Government and the Government had an opportunity to investigate, which Bayada contends occurred here. This is referred to as the "government knowledge" rule. Alternatively, Bayada argues that public policy favors enforcement of a pre-filing release where the Government has declined to intervene in a *qui tam* lawsuit, as it did here. United States. ex rel. Whitten v. Triad Hosps., Inc., No. CIV.A. CV202-189, 2005 WL 3741538 (S.D. Ga. Oct. 27, 2005), rev'd on other grounds 210 F. App'x 878 (11th Cir. 2006).

Turning to Bayada's first theory, the "government knowledge" rule has developed across several circuits. While questions of contract enforceability are generally a matter of state law, federal common law may replace state law where "a significant conflict exists between [a] federal policy or interest and the operation of state law, or the application of state law would frustrate specific objectives of federal legislation." United States ex rel. Ritchie v. Lockheed Martin Corp., 558 F.3d 1161, 1168 (10th Cir. 2009) (quoting Boyle v. United Techs. Corp., 487 U.S. 500, 507 (1988)). Thus, because the goals of the FCA are what fuel these courts' decisions as to whether to enforce pre-filing releases to bar FCA claims, the aforementioned circuits have developed and applied a balancing test grounded in federal common law. See United States ex

---

[2]     Relators assert they are entitled to discovery to determine whether the Separation Agreements intended to encompass FCA claims and that this alleged factual issue is better suited for summary judgment. They provide no authority for this position, but, because I conclude below that public policy weighs against enforcement of the Separation Agreements, I need not resolve this issue.

rel. Ladas v. Exelias, Inc., 824 F.3d 16 (2d Cir. 2016) (declining to enforce the pre-filing release as a matter of public policy); United States ex rel. Radcliffe v. Purdue Pharma L.P., 600 F.3d 319, 332–33 (4th Cir. 2010) (enforcing the pre-filing release); Ritchie, 558 F.3d at 1169–70 (enforcing the pre-filing release); United States ex rel. Longhi v. United States, 575 F.3d 458 (5th Cir. 2009) (declining to enforce the post-filing release); United States ex rel. Hall v. Teledyne Wah Chang Albany, 104 F.3d 230, 233–34 (9th Cir. 1997) (enforcing the pre-filing release).

This balancing test derives from the Supreme Court case of Town of Newton v. Rumery, 480 U.S. 386 (1987), which states that "a promise is unenforceable if the interest in its enforcement is outweighed in the circumstances by a public policy harmed by enforcement of the agreement." Id. at 392. The public policy recognized in FCA *qui tam* cases "is to 'set up incentives to supplement government enforcement' of the Act by 'encourag[ing] insiders privy to fraud on the government to blow the whistle on the crime.'" Hall, 104 F.3d at 233 (internal citations omitted). The Fourth, Ninth, and Tenth Circuits agree that where the government has knowledge of the claims before the relator files the *qui tam* lawsuit, public policy weighs in favor of enforcing a pre-filing release of claims. Id. (discussing public interest in use of qui tam suits to supplement enforcement of FCA and have information brought forward not implicated where government was aware of allegations); Ritchie, 558 F.3d at 1169–70 ("[T]he disclosures to the government in this case were sufficient to satisfy the public interest in uncovering fraud."); Radcliffe, 600 F.3d at 332 ("[W]hen the government is aware of the [FCA] claims, prior to suit having been filed, public policies supporting the private settlement of suits heavily favor enforcement of a [pre-filing] release.").

The Ninth Circuit first discussed this framework in <u>United States ex rel. Green v.</u> <u>Northrop Corp.</u>, 59 F.3d 953 (9th Cir. 1995), wherein the court declined to enforce pre-filing releases as barring FCA *qui tam* claims, observing the following:

> We think it plain that enforcing a [pre-filing] release of a *qui tam* claim would dilute significantly the incentives that Congress attempted to augment in amending the Act. If the release will be enforced, a party will have no right or reason to file a *qui tam* claim. We further believe that impairing these incentives will impair significantly the operation of the FCA. Although not all *qui tam* claims will be settled prior to the filing of an action, it appears that, for the reasons discussed below, relators have significant incentives to enter into such agreements. And although, as Appellees maintain, enforcing the Release at issue in this case would not <u>prohibit</u> a relator from coming forward with information concerning Appellees' alleged misconduct, our analysis of the structure and purposes of the Act demonstrates that this consideration is not dispositive. If the *qui tam* provisions <u>never</u> had been enacted, presumably whistleblowers still <u>could</u> come forward. The Act reflects Congress's judgment that <u>incentives to file suit</u> were necessary for the government to learn of the fraud or to spur government authorities into action; permitting a [pre-filing] release when the government has neither been informed of, nor consented to, the release would undermine this incentive, and therefore, frustrate one of the central objectives of the Act. <u>Id.</u> at 965 (emphasis in original).

Importantly, the court stated that "[pre-filing] releases of *qui tam* claims, when entered into without the United States' knowledge or consent, cannot be enforced to bar a subsequent *qui tam* claim." <u>Id.</u> at 969. Thus, critical to the <u>Green</u> court's decision not to enforce the releases was the fact that "the government only learned of the allegations of fraud and conducted its investigation <u>because of the filing of the qui tam complaint</u>." <u>Id.</u> at 966 (emphasis in original).

The Ninth Circuit later reaffirmed these principles in <u>United States ex. rel. Hall v.</u> <u>Teledyne Chang Albany</u>, 104 F.3d 230 (9th Cir. 1997), finding that the release was enforceable where the Government was aware of the allegations regarding false certifications before the relator signed a release. <u>Id.</u> at 233−34. In <u>Hall</u>, the relator worked as an engineer for a company that supplied parts to the Government. <u>Id.</u> at 231. In 1990, he complained of alleged fraud to management, who in 1991 informed the Nuclear Regulatory Commission of his concerns. <u>Id.</u>

The relator filed his own complaint with the Nuclear Regulatory Commission in 1991 and was subsequently suspended. Id. After his suspension, he filed a retaliation case with the Department of Labor and then a state court action alleging claims for whistleblowing retaliation, intentional infliction of emotional distress, fraudulent inducement to accept employment, and violation of the state RICO statute. Id. at 231–32. While the relator did not bring FCA claims in state court, the Ninth Circuit observed that he had alleged fraud in the state court action. Id. at 232. The relator subsequently settled the state suit and signed a general release of claims. Id. He then filed his federal *qui tam* case alleging violations of the FCA in 1994. Id. The Ninth Circuit enforced the release to bar the *qui tam* claims, concluding that, because the Government was aware of the alleged fraud, "the public interest in having information brought forward that the government could not otherwise obtain [was] not implicated." Id. at 233. In doing so, the court noted that "the concerns that led [the court] to deny enforcement in Green [were] not present" because the Government was aware of the relator's allegations regarding fraud. Id.

The Tenth Circuit next addressed the release issue in United States ex rel. Ritchie v. Lockheed Martin Corp., 558 F.3d 1161 (9th Cir. 2009). There, the relator worked for Lockheed and brought concerns about fraud to the attention of various parties within Lockheed as follows: she talked to a human resources manager in 2002 and made a complaint to Lockheed's ethics officer in May 2003, and Lockheed then informed the Air Force and the Defense Contract Management Agency of her concerns. Id. at 1164. Shortly thereafter, the Defense Contract Audit Agency ("DCAA") conducted its own audit, assisted by the relator. Id. at 1164–65. The DCAA told the relator she could take her concerns directly to the Defense Criminal Investigative Services ("DCIS") and also made its own referral to DCIS. Id. at 1165. The relator

subsequently settled a whistleblower case with Lockheed and signed a release. Id. Ten days later, she filed a federal *qui tam* action bringing FCA claims. Id.

The Tenth Circuit enforced the release to bar her FCA claims, explaining that "the disclosures to the government were sufficient to satisfy the public interest of uncovering fraud." Id. at 1170–71. The court pointed out that the Government had conducted its own inquiry into the relator's allegations, and that the scope of the investigation was expanded due to the relator's disclosures. Id. Additionally, the disclosures to the Government were made before the relator signed her release and before she filed the federal lawsuit, and the court observed that "[e]nforcing releases of [*qui tam*] claims only when the allegations of fraud have been disclosed to the government before the release also has the benefit of encouraging voluntary disclosure by government contractors." Id. at 1170. The court concluded that, "[u]nder these circumstances, the federal government had ample opportunity to uncover and prosecute any fraud that had taken place." Id. at 1171.

In United States ex rel. Radcliffe v. Purdue Pharma L.P., 600 F.3d 319 (4th Cir. 2010), the Fourth Circuit applied the "government knowledge" rule to enforce a release signed before a relator filed a federal *qui tam* case. The relator had worked as a district sales manager for Purdue and in 2005, sent an email using an alias name to Purdue's director and general counsel offering to settle a whistleblower claim against the company for fraud based on deceptive pharmacology. Id. at 322. The relator sent a subsequent email from the alias seeking to "settle" his *qui tam* claims with Purdue, although he had not yet brought any such claims. Id. He also anonymously contacted an Assistant United States Attorney to determine whether the Government was interested in his claims, but did not share the particulars of his claims. Id. The relator then

signed a release of claims in August of 2005 and filed a federal *qui tam* suit on September 27, 2005. Id. at 323.

Meanwhile, the Government had been separately investigating Purdue since 2002. Id. at 322–23. In June of 2005, an attorney representing several other Purdue employees spoke with an attorney from the Department of Justice about upcoming grand jury testimony regarding claims similar to the relators'. Id. at 323. Evidence showed that the Government had drafted a subpoena seeking documents relevant to the claims and requested numerous related documents. Id. The Government continued its investigation of Purdue after the relator signed the release. Id. Based on these facts, the Fourth Circuit concluded that the Government was aware of the claims "prior to the suit having been filed" and thus the public policy of supporting the private settlement of suits "heavily favor[ed] enforcement" of the release. Id. at 332. The court determined that the facts before it were similar to those in Ritchie and the allegations of fraud were sufficiently disclosed to the Government prior to the relators' filing of the federal *qui tam* suit. Id. at 332–33 (citing United States ex rel. Ritchie v. Lockheed Martin Corp., 558 F.3d 116 (10th Cir. 2009)).

Most recently, the Second Circuit applied the "government knowledge" rule in United States ex rel. Ladas v. Exelis, Inc., 824 F.3d 16 (2d Cir. 2016), holding that the Government did not have knowledge of alleged fraud prior to the filing of the qui tam lawsuit. The court concluded that the documents that allegedly notified the Government of fraud did not provide such notification. Id. at 23–24. Rather, a letter submitted to the Government constituted only partial disclosure that "did not give the government any notice as to false statements or allegations of fraud," and a report was insufficient to alert the Government of the relator's allegations of fraud. Id.

Based on the precedent discussed above, the primary inquiry under the "government knowledge" rule is when the Government knew about the alleged fraud, such that it had an opportunity to investigate. Here, as evidence that the Government was aware of Relators' fraud allegations, Bayada points to Relators' original Complaint, which alleges that "[p]rior to filing this Complaint, Relators voluntarily disclosed to the Government the information upon which this action is based." (Def.'s Mot. to Dismiss at 7–8 (quoting Compl. ¶ 7).) Relators note that the Amended Complaint states that "[s]hortly before filing their original Complaint, Relators disclosed a draft copy of the initial False Claims Act qui tam Complaint . . . to the United States Attorney's Office for the Eastern District of Pennsylvania." (Am. Compl. ¶ 7.)

Because the pleading language indicates that the Government was aware of the fraud allegations only through a draft copy of the Complaint, this case is more similar to Green, where "the government only learned of the allegations of fraud and conducted its investigation because of the filing of the qui tam complaint." See United States ex rel. Green v. Northrop Corp., 59 F.3d 953, 966 (9th Cir. 1995). Certainly, the present situation of the Government receiving a draft complaint "shortly before" the filing of the Complaint is starkly different from the situations in Hall, Ritchie, and Radcliffe, where the Government conducted significant internal investigations or audits in advance of any litigation. See United States ex rel. Ritchie v. Lockheed Martin Corp., 558 F.3d 1161, 1164 (10th Cir. 2009) (noting that the Government investigated the claim through an internal audit before the relator signed the release); United States ex rel. Hall v. Teledyne Wah Chang Albany, 104 F.3d 230, 233 (finding that "[t]he federal government was aware of [relator's] allegations regarding false certifications" where a federal agency investigated the complaint prior to the release); United States ex rel. Radcliffe, 600 F.3d 319, (4th Cir. 2010) (finding that the Government had knowledge where it initiated

investigations almost two years prior to the signing of the release and subsequent lawsuit). Here, the Government appears to have initiated and performed its investigation only while the case has been pending before me, evidenced by the multiple extension requests that have extended the seal for approximately one year.

This case is further distinguishable from Hall, Ritchie, and Radcliffe because the Government did not learn of Relators' fraud claims until after they signed their Separation Agreements and released their claims. This fact places this case in contrast to Hall, Ritchie, and Radcliffe, where the relators notified the Government of alleged fraud before signing the releases. Unlike those cases, the Government here learned of the claims when it was provided with the draft complaint, which was after the releases had been signed. As noted by another district court, "[w]hile [defendant] asserts that the government need only be made aware of the allegations prior to the filing of the *qui tam* complaint, it is clear that the policy interests . . . would not be served if the government's knowledge did not precede the execution of the release." United States ex rel. McNulty v. Reddy Ice Holdings, Inc., 835 F. Supp. 2d 341, 360 (E.D. Mich. 2011).

Where the Government does not have knowledge of the claims that form the basis for the *qui tam* complaint before the relators signed the release, enforcement of the release "interferes with and frustrates the FCA's goals of incentivizing individuals to reveal fraudulent conduct to the government." Id. at 360 ("[T]he issue is not what the government knew at the time the *qui tam* action was filed but what the government knew at the time the release was signed."). Accordingly, I disagree with Bayada that service of a draft of the Complaint was sufficient to

notify the Government of fraud in such a way to encourage the underlying policy interests of the FCA.[3]

Bayada also contends that enforcement of the Separation Agreements will not violate public policy because the Government declined to intervene. Relators respond that the Government may decline to intervene in a *qui tam* action for a variety of reasons. Indeed, the Government notes in its Statement of Interest that its decision not to intervene should not be weighed when considering whether public policy favors enforcement of a pre-filing release.

Bayada cites to <u>United States. ex rel. Whitten v. Triad Hosps., Inc.</u>, No. CIV.A. CV202-189, 2005 WL 3741538 (S.D. Ga. Oct. 27, 2005), <u>rev'd on other grounds</u> 210 F. App'x 878 (11th Cir. 2006) in support of this position. In <u>Whitten</u>, the district court reviewed and distinguished

---

[3]     Relators also point out that they provided the Government with the draft complaint to comply with the "original source" pre-filing requirements of the FCA, best practices in FCA cases, and common courtesies in FCA litigation. They submit that it would contradict the intent of the FCA to use the mandated disclosure as a factual basis to enforce a release.

In a Statement of Interest, the Government submits that Relators' pre-suit disclosure to the Government was not independent of the *qui tam* action and should not bar Relators' *qui tam* suit. Like Relators, the Government asserts that barring Relators' claims because they shared a draft complaint in order to comply with the pre-filing requirements of the FCA would be inconsistent with Congressional intent and frustrate the FCA's purpose.

Bayada argues that the original source exception applies only if there has been prior public disclosure of the information serving as the basis for Relators' complaint, and thus is an exception to a jurisdictional bar rather than a requirement to initiate an FCA case.

31 U.S.C. § 3730(e) bars certain FCA actions, such as those not brought by an "original source." An "original source" is someone who "either (1) prior to a public disclosure under subsection (e)(4)(a), . . . voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section." 31 U.S.C. § 3730(e)(4)(B).

While Bayada's contention may be true, Relators represent that they shared their draft complaint in an effort to comply with that they believed the requirements of the FCA to be. (<u>See</u> Am. Compl. ¶ 7.) To use Relators' disclosure of the draft Complaint as the factual basis to enforce the release in the Separation Agreements because Relators were mistaken as to the original source doctrine would be inappropriate. Doing so would surely frustrate Congress's intent in enacting the FCA.

Green, observing that "the Green court did not consider whether a relator who has signed a release ought to be able to maintain a *qui tam* action in cases where the government has declined to intervene." Id. at *4 (emphasis in original). The district court determined that where the government has declined to intervene, "public policy favors the enforcement of agreements [containing releases]." Id. at *5.

I disagree with the Whitten court's conclusion for several reasons. First, as observed by many courts, the Government can choose not to intervene in a *qui tam* action for a number of reasons, many of which can be unrelated to the merits of the case. See, e.g., United States v. ex rel. Atkins v. McInteer, 470 F.3d 1350, 1360 n.17 (11th Cir. 2006) ("We do not assume that in each instance in which the government declines intervention in an FCA case, it does so because it considers the evidence of wrong doing insufficient or the qui tam relator's allegations for fraud to be without merit. In any given case, the government may have a host of reasons for not pursuing a claim."); United States ex rel. Spay v. CVS Caremark Corp., 913 F. Supp. 2d 125, 144 n.3 (E.D. Pa. 2012) ("[T]he government emphasized that its decision not to intervene should not be interpreted as a comment on the merits of Plaintiff's claims."); United States ex rel. Powell, American InterContinental Univ., Inc., No. 08-cv-2277, 2012 WL 2885356, at * 11 (N.D. Ga. July 12, 2012) (disagreeing with Whitten). Second, because a potential relator could be unaware of whether the Government will intervene in an action, the application of the Whitten court's rule could result in fewer relators coming forward to expose fraud, which undermines the FCA's central purpose. See Powell, 2012 WL 2885356, at * 11. Thus, I conclude that the mere fact of the Government's decision not to intervene is not enough to enforce the releases where the Government did not have sufficient notice of the fraud allegations prior to the filing of the lawsuit.

In light of the above discussion, I find that public policy does not weigh in favor of enforcing the Separation Agreements to bar Relators' *qui tam* action. The facts before me are distinct from those in <u>Hall</u>, <u>Ritchie</u>, and <u>Radcliffe</u> because the Government did not have sufficient knowledge of Relators' allegations prior to the signing of Relators' releases. This case is more analogous to <u>Green</u> where the underlying policy of encouraging laypeople to come forward with information to assist the Government with uncovering fraud would not be served by enforcing the Separation Agreements.

## B. Relators Have Stated a Claim under the FCA

### i. *Overview of FCA Claims*

Relators have brought this suit as *qui tam* relators on behalf of the Government to enforce three provisions of the FCA. Congress enacted the Fraud Enforcement Recovery Act ("FERA"), Pub. L. No. 111-21, 123 Stat. 1617 (2009), on May 20, 2009, which amended the FCA. Relators first allege violations of post-FERA § 3729(a)(1)(A) for knowingly presenting or causing to be presented false claims to the Government. Relators also allege violations of post-FERA § 3729(a)(1)(B) for making or using false statements or records material to a false claim. Finally, Relators allege violations of post-FERA § 3729(a)(1)(G) for knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government.

The Third Circuit recognizes two categories of false claims under the FCA: a factually false claim and a legally false claim. <u>United States ex rel. Wilkins v. United Health Grp., Inc.</u>, 659 F.3d 295, 305 (3d Cir. 2011), <u>abrogated on other grounds by Universal Health Servs., Inc. v.</u>

United States, 136 S. Ct. 1989 (2016). A legally false claim, like those alleged here, is based on a "false certification" theory of liability. Id. False certifications may be express or implied. Id. at 305–06. A defendant violates the FCA under express false certification "when, in conjunction with a request for Federal funds, it certifies that it is in compliance with regulations that are requirements for payment." U.S. ex rel. Krahling v. Merck & Co., 44 F. Supp. 3d 581, 592 (E.D. Pa. 2014) (citing Wilkins, 659 F.3d at 305, abrogated on other grounds by Universal Health Servs., Inc. v. United States, 136 S. Ct. 1989 (2016)). A defendant violates the FCA under implied certification "when a defendant submits or causes to be submitted a request for payment without disclosing that it is in violation of a regulation that affect its eligibility for payment." Id. (citing Wilkins, 659 F.3d at 305, abrogated on other grounds by Universal Health Servs., Inc. v. United States, 136 S. Ct. 1989 (2016)).

Bayada contends the entire Amended Complaint should be dismissed pursuant to both 12(b)(6) and 9(b) for failure to state a claim.

### ii. The Amended Complaint Satisfies Rule 12(b)(6)

Bayada urges that Relators have failed to state a claim under 12(b)(6) first because under the Medicare rules, Bayada is entitled to rely on the judgment of certifying physicians and Relators have not alleged the absence or invalidity of physician certifications. Relatedly, Bayada contends that Relators' allegations regarding unnecessary homebound services represent Relators' subjective judgment and disagreement over subjective clinical decision-making, which cannot form the basis of FCA liability. Second, Bayada argues that the Amended Complaint is devoid of allegations demonstrating that Bayada treated patients who did not meet Medicare's criteria for homebound status.

In response to Bayada's first argument, Relators contend that a physician's clinical judgment is not required to determine homebound status and an RN's medical opinion is sufficient to state a claim for relief under the FCA. Relators also submit that Bayada's physician certification argument turns on factual allegations, which are appropriately considered at the summary judgment stage and not the pleading stage.

I agree with Relators on this last point. Bayada provides no authority supporting its assertion that Relators must plead the non-existence or inadequacy of physician certifications to allege a false claim under the FCA. While it is true that to qualify for homebound services patients must be under the care of a physician and under a plan of care that was established by a physician and periodically reviewed by a physician, this is irrelevant as to whether Relators have sufficiently alleged that Bayada submitted false claims to Medicare for homebound services.

Similarly, Bayada has not provided any authority for its position that Relators must allege facts suggesting that Bayada was unjustified in relying on physician certifications in order to state an FCA claim. If Bayada's position were correct, a non-physician relator could never bring an FCA claim as it is unlikely that non-physicians have knowledge as to whether a physician properly certified a patient for homebound service. Bayada's argument is more appropriate for summary judgment where it may present facts, such as the existence of proper physician certifications, as evidence of homebound status to refute Relators' allegations of falsity.

Regarding Bayada's second argument—that the Amended Complaint lacks allegations demonstrating that Bayada treated patients who did not meet Medicare's criteria for homebound status—Bayada essentially asks me to disbelieve Relators' allegations. In an attempt to undermine Relators' allegations, Bayada suggests alternative interpretations of the facts pled as to patients C.P., M.C., and V.A. For example, Bayada invites me to conclude that patient C.P.

did not answer her phone because she was not ambulatory, or that patient V.A. was denied her casino trips and confined to the facility not so that Bayada could retain its false payments and continue to submit further false claims to Medicare, but because she was in fact homebound. At this stage of the case, I cannot, of course, accept Bayada's hypothetical scenarios in place of Relators' allegations.[4]

Bayada also points to Medicare guidance that states that a patient may be considered homebound if "absences from the home are infrequent or for periods of relatively short duration, or are attributable to the need to receive health care treatment." See MBPM, ch. 7, § 30.1.1. Bayada contends that Relators have failed to allege that, in light of this guidance, patients C.P. and M.C. were not homebound. Bayada again is asking me to replace Bayada's allegations with its own interpretation of the facts. Relators have pled that C.P. was "frequently away from home" and M.C. was "frequently leaving home for reasons unrelated to her medical treatment," and I must accept those facts as true at this stage. See Great W. Mining & Mineral Co. v. Fox Rothschild LLP, 615 F.3d 159, 176 (3d Cir. 2010) (emphasizing that "at the motion to dismiss stage, the factual matter in the complaint must be taken as true").

Bayada's arguments are clearly better suited for summary judgment; Consequently, I will deny their request for dismissal under 12(b)(6).

### iii.     The Amended Complaint Satisfies Rule 9(b)

---

[4]     Bayada also presses that Relators have alleged an incomplete definition of "homebound." It submits that a patient is "homebound" if she (1) needs the aid of supportive devices, special transportation, or another person in order to leave her home; and (2) is normally unable to leave home, and doing so requires considerable or taxing effort. (Mot. at 16 (citing MBPM, ch. 7, § 30.1.1.)) The definition alleged by Relators in the Amended Complaint is that a patient is "homebound," if she is "is generally confined to her home and can leave only by dent of considerable effort." (Am. Compl. ¶ 9.) At this stage, Relators need only plead sufficient facts such that it is plausible that Bayada was providing home health services to patients who were not homebound. Even if Relators' alleged definition of homebound is incomplete, for the reasons articulated infra, I find that they have sufficiently alleged that Bayada was providing home health services to patients who were not homebound.

I will now turn to Bayada's request that I dismiss the Amended Complaint pursuant to Rule 9(b), which is premised on its belief that Relators have not pled fraud with sufficient particularity. More specifically, Bayada claims that Relators have failed to allege the submission of a "single" false claim. Bayada also maintains that Relators' patient examples do not satisfy Rule 9(b).

To state a prima facie FCA violation under § 3729(a)(1), Relators must allege with sufficient particularity that "(1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent." United States ex rel. Wilkins v. United Health Grp., Inc., 659 F.3d 295, 305 (3d Cir. 2011), abrogated on other grounds by Universal Health Servs., Inc. v. United States, 136 S. Ct. 1989 (2016) (internal citations omitted). In a false certification case like this one, a relator does not need to produce a specific instance of a false claim. Id. at 308 ("We have never held that a plaintiff must identify a specific claim for payment at the *pleading stage* of the case to state a claim for relief."). Bayada does not seem to contest the sufficiency of the pleadings as to the first and third elements of § 3729(a)(1), but instead focuses on the second.

As to the elements of § 3729(a)(1), Relators plainly allege that Bayada submitted claims for payment to the Government. They allege that to enroll as a Medicare provider, Bayada was required to, and did, submit a Medicare Enrollment Application for Institutional Providers (Form 855A), and, in submitting this form, made a "Certification Statement" agreeing to abide by the Medicare laws, regulations, and applicable program instructions. Through this Certification Statement, Bayada also stated that it "underst[ood] that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws,

regulations, and program instructions . . ., and on the provider's compliance with all applicable conditions of participation in Medicare." Relators further allege that Bayada billed Medicare by submitting a claim form (Form 1450) to the fiscal intermediary responsible for administering Medicare home health claims on behalf of the Government, and that each time it submitted a claim to the Government through the intermediary it certified that the claim was true, correct, complete, and in compliance with all Medicare laws and regulations. They thus allege that Bayada certified that each claim for home health prospective payment represented home health services provided to a qualifying homebound patient in need of such services, and payment was conditioned on the truth and accuracy of that certification. Relators contend that Bayada also certified that its programs were in compliance with Medicare regulations, including the requirement that Bayada perform and correctly document its skilled nursing and supervisory visits. (Am. Compl. ¶¶ 21–23.) These allegations sufficiently state that Bayada presented or caused to be presented to an agent of the Government a claim for payment.

Turning to the second element of § 3729(a)(1) that the claim was fraudulent, as already noted, Relators' claims are generally that Bayada knowingly submitted false claims for home healthcare services provided to patients that it knew were not homebound or did not require skilled care, rendering them ineligible for home healthcare. Relators submit the following facts as evidence of the falsity of these claims:

- Relator Davis was aware of "numerous patients" who either refused home health services or contacted Bayada's offices to request they be removed from home health services because they no longer required such care;

- Relator Davis was directed by administrators Richard York and Karen Rizzo to schedule follow-up phone calls with these patients which were "designed to persuade the patients to acquiesce to admission or re-admission";

- Jason Wedman, a Bayada physical therapist, "frequently kept patients on unnecessarily and for long periods," and Relator Davis "often" received phone

calls from patients of Wedman who believed they did not need further therapy and requested to be taken off service but Wedman "talked them into" remaining on service;

- Patient C.P. was certified as homebound and in need of skilled nursing in November of 2014, and caregivers were scheduled to visit C.P. twice a week for wound care. C.P. "frequently" could not be reached by telephone at home. Relator Banata pre-scheduled times for her visits to C.P. because C.P. was "frequently" away from her home, and on one visit, C.P. told Relator Banata that she would not be home for the next visit because she had a "big birthday party" to attend. Despite reports of "such excursions" to Bayada, Relator Banta was instructed to continue providing home health services to C.P. Bayada continued to bill the United States for unnecessary care for C.P. until approximately January of 2015 despite its "express knowledge" that C.P. was not homebound;

- Relator Banta was the assigned RN for patient M.C. who was originally admitted for wound care and subsequently hospitalized for symptoms related to congestive heart failure. When M.C. returned home from the hospital, Relator Banta found that her wound had healed and her congestive heart failure was well-managed. Relator Banta also found that M.C. was not homebound because she was "frequently" leaving home for reasons unrelated to her medical treatment. Despite this, manager Sara Gates instructed Relator Banta not to discharge M.C. because "it would result in a partial episode and cost Bayada money." Relators allege that instead, Bayada charged the Government for Relator Davis to educate M.C. about management of her congestive heart failure, even though M.C. was an RN herself and was familiar with congestive heart failure and its management. According to Relators, M.C.'s condition was well-managed and did not require skilled nursing care. M.C. was eventually discharged when she left town for a holiday trip, yet Bayada retained all payments received from Medicare for Patient M.C.'s purported education even after they learned she was frequently leaving home and planned her holiday trip out of town;

- Patient V.A. was certified as homebound and visited by Bayada every three weeks to have her catheter changed by nurse Laura Weinstein. V.A. was living in a facility at the time that Bayada billed for her care, and the facility provided weekly transportation to a casino. Bayada staff knew that V.A. participated in these tips and enjoyed them during the time she was certified as homebound and her services were being billed to the Government. Relators allege Bayada knew from these casino visits that V.A. was not homebound and that discovery of these visits by the Government would result in the Government learning of Bayada's false certification. Instead, rather than reporting these excursions or reimbursing Medicare, Bayada staff attempted to cover up the trips and retain the payments. Relators allege that Bayada warned the staff at the facility in which V.A. resided to refuse to

permit V.A. to continue her casino trips in order to make it appear she was homebound, although she was not. Bayada allegedly threat[en]ed to cease sending Nurse Weinstein to help the facility with catheter changes if the facility staff did not stop V.A. from going on the casino trips. As such, V.A. was denied her weekly casino trips and confined to the facility so that Bayada could retain its false payments from Medicare and continue to submit further false claims to Medicare; and

- Bayada knowingly billed Medicare for these three patients whom they knew or should have known were not homebound, and retained payments and concealed or knowingly and improperly avoided its obligations to reimburse the Government for these patients. (Am. Compl. ¶¶ 2, 25–27, 29.)

Additionally, Relators allege the qualifications for home healthcare reimbursement under Medicare, the assessments that are required for a patient to be evaluated, what Medicare pays for when a patient qualifies for homebound services, how Medicare pays for those services, the certifications that Bayada was required to submit, and that Bayada billed Medicare for home health claims. Relators plead that Bayada certified that each claim for home health prospective payment was provided to a qualifying homebound patient, and payment for these services was conditioned on these certifications being true and accurate. Relators further plead that Bayada certified that its programs were in compliance with Medicare regulations. (Id. ¶¶ 9–24.)

Taking these allegations as true and reading them in the light most favorable to Relators, as I must, I find that Relators have sufficiently alleged that Bayada was billing Medicare for home health services provided to patients who were not homebound. Relators have provided enough details to plausibly suggest that the three example patients were not homebound. C.P. was "frequently" not at home, "frequently" could not be reached by phone, required pre-scheduled times for visits, and informed Relator Banta she would be away from her home because she had a birthday party to attend. M.C. "frequently" left home yet was not discharged, received instructional education to manage her condition from Relator Banta despite her condition being well-managed, and was eventually discharged when she left town for a vacation.

Finally, V.A. participated in weekly trips to a casino, which Bayada knew about and attempted to cover up by disallowing V.A. from participating in the trips so that she would appear homebound. Bayada's belief that the three patients qualified as homebound is not something I can consider at this stage of the case.

The Third Circuit does not require "every detail necessary to support a finding of fault at the pleading stage." See United States v. Loving Care Agency, Inc., 226 F. Supp. 3d 357, 368 (D.N.J. 2016) (finding sufficient allegations where relator pled representative individuals she examined and determined were not eligible for services). Rather, plaintiffs are only required to "provide particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." Foglia v. Rental Ventures Management, LLC, 754 F.3d 153, 157–58 (3d Cir. 2014). Relators have satisfied this requirement by pleading sufficient facts that lead to the inference that Bayada was billing for patients it knew did not meet Medicare's definition of homebound. Bayada's contention that Relators have failed to allege a "single" false claim ignores the Third Circuit's observation that it "ha[s] never held that a plaintiff must identify a specific claim for payment at the pleading stage of the case to state a claim for relief." United States ex rel. Wilkins v. United Health Grp., Inc., 659 F.3d 295, 308 (3d Cir. 2011), abrogated on other grounds by Universal Health Servs., Inc. v. United States, 136 S. Ct. 1989 (2016) (emphasis in original); see also United States ex rel. Krahling v. Merck & Co., Inc., 44 F. Supp. 3d 581, 593–94 (E.D. Pa. 2014).[5]

---

[5]     Citing to United States ex rel. Branhan v. Mercy Health Sys., 188 F.3d 510 (6th Cir. 1999), Bayada also asserts that the Amended Complaint is insufficient under 9(b) because it does not provide the identity of a person who submitted or caused the submission of a false claim. But in Branhan, the Sixth Circuit dismissed a *qui tam* case brought under the FCA for lack of subject matter jurisdiction. Only in the alternative did the court observe that even if it did have jurisdiction, the plaintiff's claims were "based on generalized accusations of wrongdoing attributed to 'defendants' without any specificity as to which employees of the defendants were engaged in the alleged fraudulent scheme." Id. at *3. Bayada points to

The purpose of 9(b)'s pleading requirements "is [to] provide defendants with notice of the precise misconduct that is alleged and to protect defendants' reputations by safeguarding them against spurious allegations of immoral and fraudulent behavior." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1418 (3d Cir. 1997). Relators have provided sufficient details for Bayada—which possesses and controls the identities of the example patients C.P., M.C., and V.A.—to ascertain further information about those patients.[6]

Finally, as to the third element of § 3729(a)(1), Relators allege that Bayada knowingly billed Medicare for the alleged false claims regarding patients C.P., M.C., and V.A. Relators also allege first-hand experience with home health services provided to patients they allege were not homebound and the billing of those services to the Government. (Am. Compl. ¶¶ 25–27.)

For purposes of this stage of litigation, these allegations provide Bayada with sufficient notice of the claims at issue, and I will deny Bayada's request for dismissal under Rule 9(b).[7]

the concern raised by the concurring opinion in Branhan—that the defendants were being grouped into "one wrongdoing monolith." Id. at *9.

Significantly, there were multiple defendants in Branhan. Because there is only one Defendant here, the facts before me are distinct and the concern in Branhan is inapplicable. Rather, while the allegations may not fully describe the "who, what, when, where, and how" of the fraud, Relators do not have access to billing records to provide information as to who exactly billed for the services. See Shmushkovich v. Home Bound Healthcare, Inc., No.12-2924, 2015 WL 7251934, at *4 (N.D. Ill. Nov. 7, 2015).

[6] Relators also represent that they have provided the actual names of the three example patients to Bayada through confidential communications with counsel. (Resp. at 18 n.12.)

[7] While Bayada moves to dismiss Counts II and III, it does not specifically address these claims in its Motion. Nonetheless, I find that Relators have sufficiently alleged these counts.

As to Count II, to state a claim for violation of § 3729(a)(1)(B), Relators must allege that Bayada (1) knowingly made, used, or caused to be made or used a false record or statement, (2) that was material to a false or fraudulent claim. In addition to the facts discussed above, Relators allege that Bayada made and used false records reflecting purported nursing and therapy visits rendered to patients who did not qualify under the Medicare home health benefit; made and used false assessment data that inaccurately reflected patient conditions and falsely emphasized that the patients were homebound when they were not; and made and used false Forms 1450 and 855A and other false certifications regarding past, present,

## IV.    CONCLUSION

For the foregoing reasons, I conclude that Relators' have standing to bring their FCA claims and thus I have subject matter jurisdiction over those claims.  I also find that Relators' Amended Complaint satisfies the requirements of Rules 12(b)(6) and 9(b).  Accordingly, I will deny Bayada's Motion to Dismiss.

An appropriate Order follows.

---

or future compliance with a prerequisite for payment or reimbursement by the Government through Medicare or Medicaid.  (Am. Compl. ¶¶ 33–34.)

Construing these facts in the light most favorable to Relators, I find that they allege that false statements were provided to the Government when Bayada billed for homebound services for C.P. from November of 2014 through January of 2015, as well as when Bayada billed for education services for patient M.C. and for homebound services for patient V.A.  (Id. ¶ 26.)  At this stage of the case, Relators have pled facts that could demonstrate Bayada provided false statements to the Government that were material to a false or fraudulent claim.

Regarding Count III, § 3729(a)(1)(G) makes liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government."  In addition to the allegations discussed supra, Relators submit that "[Bayada] knew that it had received much needed Medicare dollars in home health PPS payments for patients who did not qualify for the Medicare home health benefit, yet . . . took no action to satisfy its obligations to the United States to repay or refund those payments and instead retained the funds and continued to bill the United States."  (Am. Compl. ¶ 38.)  For purposes of this stage of the case, Relators have sufficiently alleged a violation of § 3729(a)(1)(G).